STATE OF NEBRASKA, APPELLEE, V. JAMES E. HAWTHORNE, APPELLANT.

431 N.W.2d 630

Filed November 18, 1988. No. 87-773.

Thomas M. Kenney, Douglas County Public Defender, and Timothy P. Burns for appellant.

Robert M. Spire, Attorney General, and Bernard L. Packett for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

As the result of a jury trial in the district court for Douglas County, James E. Hawthorne was convicted of first degree sexual assault, namely, sexual penetration of another by force, threat of force, coercion, or deception in violation of Neb. Rev. Stat. § 28-319(1)(a) (Reissue 1985). In his lone assignment of error, Hawthorne claims that he was denied the right to effective assistance of counsel, which is guaranteed by the sixth amendment to the U.S. Constitution. Hawthorne does not claim a violation of his right to counsel guaranteed by Neb. Const. art. I, § 11. Hawthorne bases his ineffective assistance of counsel claim on the fact that his retained lawyer, during direct examination of Hawthorne at trial, elicited that, more than 10 years before the trial for first degree sexual assault, Hawthorne was convicted of a felony, which evidence is inadmissible by virtue of Neb. Evid. R. 609 (Neb. Rev. Stat. § 27-609 (Reissue 1985)). In this appeal, Hawthorne is represented by court-appointed counsel, the Douglas County

public defender's office.

Regarding a convicted defendant's claim of a sixth amendment violation concerning assistance of counsel, the U.S. Supreme Court stated in *United States v. Cronic*, 466 U.S. 648, 659 nn.25-26, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984):

> The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding. [Citations omitted.]
>
> Apart from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt. See *Strickland v. Washington, post*, at 693-696 [citations omitted].

After *United States v. Cronic, supra*, but on the same day, the U.S. Supreme Court issued *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), in which the Supreme Court fashioned a test and factors to be considered in determining whether a convicted defendant has been denied the sixth amendment right to assistance of counsel in reference to defense counsel's alleged deficient performance in representing the accused. In *Strickland*, the Court adopted a two-part test regarding a convicted defendant's claim of ineffective assistance of counsel, namely:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown

in the adversary process that renders the result unreliable. 466 U.S. at 687.

The *Strickland* Court then stated: "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness," 466 U.S. at 687-88, and continued:

> An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. [Citation omitted.] The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.

466 U.S. at 691-92.

The *Strickland* Court next discussed certain sixth amendment contexts in which prejudice is legally presumed; for example, actual or constructive denial of the assistance of counsel at a critical stage of a criminal proceeding, interference with the assistance of counsel, and, in certain situations, counsel operating under a conflict of interest. After considering situations of presumed prejudice, the Court observed:

> Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice. . . . Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. They cannot be classified according to likelihood of causing prejudice. Nor can they be defined with sufficient precision to inform defense attorneys correctly just what conduct to avoid. Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another. Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse

effect on the defense.
466 U.S. at 693.

In reference to the two-part test for a determination whether counsel's deficient performance prejudiced an accused's defense, the Court, in *Strickland*, then characterized the prejudice which must be shown to warrant overturning a defendant's conviction: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

In *Strickland v. Washington*, 466 U.S. 668, 695-96, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Court hastened to point out:

> The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. . . .
>
> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.
>
> . . . In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of

a breakdown in the adversarial process that our system counts on to produce just results.

The *Strickland* Court concluded:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

466 U.S. at 697.

Therefore, according to the test adopted in *Strickland v. Washington, supra,* to sustain a claim of ineffective assistance of counsel as a violation of the sixth amendment to the U.S. Constitution and thereby obtain reversal of a defendant's conviction, the defendant must show that (1) counsel's performance was deficient and (2) such deficient performance prejudiced the defense, that is, a demonstration of reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. As used in the *Strickland* test, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. Cf. *State v. Lenz,* 227 Neb. 692, 699, 419 N.W.2d 670, 674 (1988), where this court, alluding to the State's burden on appeal, expressed: "[E]rror in admitting or excluding evidence in a criminal trial, whether of constitutional magnitude or otherwise, is prejudicial unless it can be said that the error was harmless beyond a reasonable doubt." Cf., also, *State v. Watkins,* 227 Neb. 677, 419 N.W.2d 660 (1988). Nevertheless,

under the *Strickland* test, the defendant has the burden to prove counsel's deficient performance, which prejudiced the defense. Thus, to a large extent, the *Strickland* test requires a judicial evaluation of evidence presented to the trier of fact and a determination concerning the likelihood of a defendant's conviction in the absence of counsel's conduct which is alleged to be deficient.

In the light of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and to place in perspective Hawthorne's claim of ineffective assistance of counsel, we must review the evidence adduced at Hawthorne's trial, which commenced on April 28, 1987, especially the evidence concerning events immediately before, at, and shortly after the sexual penetration alleged in the charge against Hawthorne.

According to the victim, who was 17 years of age, she spent an evening with her brother at a friend's house and, shortly after 9 p.m., left to walk to her home located approximately a mile away. As the victim walked toward her home, a taxicab, driven by 33-year-old Hawthorne, stopped. The victim had cab fare, and, when Hawthorne asked whether the victim needed a ride, she answered "yes." As the pair proceeded in Hawthorne's cab toward the victim's home, Hawthorne remarked that he had to make "another run" and inquired whether the victim would mind riding along on the side trip, which took the cab to an apartment building previously visited by some of the victim's relatives. Hawthorne stopped the cab, entered the apartment, returned, and asked the victim to enter the apartment with him. Inside the apartment, Hawthorne directed the victim to disrobe, but, after she refused, the two returned to the cab and continued traveling toward the victim's home. Near an abandoned building, Hawthorne parked the cab and told the victim to disrobe. When the victim attempted to leave the cab, Hawthorne grabbed her arm and, as she was trying to free herself, pulled the frightened and crying victim into the cab and threatened to harm her. When the victim had disrobed at Hawthorne's demand, Hawthorne proceeded to have vaginal intercourse with her. After sexual relations with the victim, Hawthorne started to drive his cab from the scene of the assault, but the victim leaped into the street and ran to a nearby

bar, where she informed one of the bar employees about the sexual assault. Police were summoned to the bar and, after an initial interview, took the victim to a hospital, where she was examined by a physician. A medical examination disclosed semen in the victim's vaginal area but no injuries, such as bruises.

An employee of the bar where the victim had gone after the sexual assault testified that the victim was crying on her entry into the bar, and, when asked what happened, the victim answered, "I was raped." A police officer, summoned to the bar in response to the victim's complaint, testified that the victim was "kind of hysterical, crying, shaken pretty bad." A female police officer then interviewed the victim, who stated that she had been sexually assaulted. During this interview, the victim was "crying and in hysterics."

Police identified the cab and Hawthorne as its driver. Without a warrant for Hawthorne's arrest, the police went to the home of Hawthorne's girlfriend and surrounded the house. When police came to the residence's door, Hawthorne, who was hiding under a bed, told his girlfriend not to answer the door. Later, police apprehended Hawthorne for sexual assault of the victim.

Hawthorne testified that the victim had hailed his cab, entered the vehicle, sat in the front passenger's seat, and stated that she was "going home." En route toward the victim's home, Hawthorne stopped his cab at an apartment building, which he and the victim entered without incident. Inside the apartment for approximately 7 minutes, the victim and Hawthorne embraced and kissed until the pair left to resume their travel to the victim's home. In the cab, the victim again seated herself in the right front seat. After a few blocks, Hawthorne pulled the cab into a vacant lot because "it was already established . . . [t]hat we were going to have sex." The victim voluntarily disrobed, and the pair engaged in sexual intercourse over a period of 25 minutes during which the victim never fought or resisted. Hawthorne denied any threat or violence toward the victim in conjunction with the pair's sexual intercourse. According to Hawthorne, after resumption of the journey to the victim's home, Hawthorne stopped his cab at a point

indicated by the victim, who got out of the cab and walked into the night. Hawthorne then drove to his girlfriend's house. As an explanation for his hiding under the bed at his girlfriend's residence, Hawthorne explained that he believed the police were somehow involved in an attempt to collect delinquent child support from Hawthorne. At this point during the direct examination of Hawthorne, and without previous evidence regarding Hawthorne's criminal history, the following occurred:

> [Hawthorne's counsel] I might as well ask you right now—we're here to bare your soul to the world—have you ever been convicted of a felony?
>
> [Hawthorne] Yes?
>
> [Counsel] How many.
>
> [Hawthorne] Two.

On cross-examination, Hawthorne was asked: "[H]ave you ever been convicted of giving false information, of lying to the police?" Hawthorne responded: "Yes." Also, during cross-examination and without objection, Hawthorne acknowledged that he had "lied" to authorities concerning his delinquency in payment of child support.

The two felonies mentioned by Hawthorne on direct examination were a burglary conviction on February 3, 1975, for which Hawthorne was sentenced to 2 years' probation, and a felony assault conviction on July 12, 1977, which resulted in Hawthorne's sentence to 2 years' probation.

In the light of testimony from the victim and Hawthorne, one essential fact was admitted by Hawthorne and, therefore, was beyond dispute—Hawthorne sexually penetrated the victim. Consequently, the jury had to decide: Was Hawthorne's sexual penetration of the victim accomplished by force? Fundamental to that jury question is still another question: Whom should the jury believe—the victim, who claimed that sexual penetration by Hawthorne was the result of force, or Hawthorne, who asserted that sexual penetration was consensual? Witness credibility, whether the victim's or Hawthorne's, was a factor in the jury's answer to those questions. The jury found Hawthorne guilty of first degree sexual assault.

In his motion for new trial, Hawthorne alleged that

there was inadvertent error when testimony was offered and received regarding two prior felony convictions when in fact there should have been evidence of but one prior felony conviction because one of the felonies was more than ten years old, which affected the jurors in determining the credibility of the Defendant.

In arguing Hawthorne's motion for new trial, Hawthorne's counsel remarked:

I stated that there was an inadvertent error when testimony was offered and received regarding two prior felony convictions when in fact there should have been evidence of but one. And then after — and I'll say inadvertent error, because I was under the belief — and I don't know how I happened to believe that it's — that, knowing that he was on probation and that the probation would have carried within a ten-year period when indeed — and I've submitted the originals of the two prior felonies to the Court . . . and I've got the copies here — both of them were more than ten years old. Pursuant to 27-609 under the new evidence code that evidence should never have come out and it was through my error that the defendant testified to those two, but I did know that he was convicted of two prior felonies but I did also know that he was put on probation and that would have carried it within the ten-year statute of limitations.

So I'm arguing that certainly through this inadvertent error the jury was prejudiced and certainly this did affect his credibility to the jury. I'm not saying that it affects his credibility under the moral code or in any other sense but to a jury indeed they're going to take into consideration the fact that he's been convicted on two prior occasions and that he has a background of lying and cheating and doing whatever those two felonies were and that indeed this affected the outcome of the case and that's why the guilty verdict was brought in by the jurors.

Hawthorne contends that his 1975 felony burglary conviction was inadmissible under Neb. Evid. R. 609(2) (§ 27-609(2)) as a means to impeach his credibility. Hawthorne

asserts that his

> trial counsel committed error when he allowed [Hawthorne] to testify that he committed two prior felonies. This act or omission was clearly outside the range of competent assistance of counsel and entitles [Hawthorne] to a new trial if [Hawthorne] was prejudiced by this act or omission.
>
> . . . .
>
> [Hawthorne's] defense depended entirely on his credibility that the sexual encounter was consensual. Accordingly, [Hawthorne's] trial counsel's action in bringing out the incompetent impeachment evidence was clearly prejudicial.

Brief for appellant at 9.

In pertinent part, Neb. Evid. R. 609 states:

> (1) For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination, but only if the crime (a) was punishable by death or imprisonment in excess of one year under the law under which he was convicted or (b) involved dishonesty or false statement regardless of the punishment.
>
> (2) Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of such conviction or of the release of the witness from confinement, whichever is the later date.

Although some conduct of counsel, such as refraining from an objection to inadmissible evidence, may be strategy at trial which binds a defendant in a criminal case, see *State v. Archbold*, 217 Neb. 345, 350 N.W.2d 500 (1984), and "Absent exceptional circumstances, [the defendant] is bound by the tactics used by his counsel at trial . . . ," *Jones v. Barnes*, 463 U.S. 745, 759, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983) (Brennan, J., dissenting), counsel's conduct at Hawthorne's trial, rooted in unfamiliarity with the Nebraska Evidence Rules, does not rise to the stature of strategy. Evidence that Hawthorne was convicted of burglary, in Nebraska a crime punishable by imprisonment in excess of 1 year (Neb. Rev. Stat.

§§ 28-507 and 28-105(1) (Reissue 1985)), when such conviction occurred more than 10 years before Hawthorne's trial, was inadmissible under Neb. Evid. R. 609(2). Divulgence of a witness' criminal past may expose a witness to a jury's disfavor. In reference to Fed. R. Evid. 609, a counterpart to Neb. Evid. R. 609, Weinstein has expressed:

> When the witness is a party, the jury's antipathy may be translated into finding him guilty or liable without regard to whether he, in fact, committed the act with which he is charged.
>
> In a criminal case, the accused with a record risks that the jury may wish to punish him because he is bad regardless of his present guilt . . . .

3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 609[02] at 609-60 (1988).

Under the circumstances, the conduct of Hawthorne's counsel in eliciting from Hawthorne testimony concerning the prior felony (burglary) conviction, which was otherwise inadmissible as evidence, was performance which fell below a standard of reasonableness required in the defense of a criminal charge, namely, conversance with the rules of evidence. Hawthorne has shown that his "counsel's performance was deficient" and has, therefore, established the first component of the test enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

However, because *Strickland* prescribes a two-part conjunctive test, we must determine whether Hawthorne has demonstrated reasonable probability that, but for his counsel's eliciting the inadmissible testimony about the burglary, the jury would have acquitted Hawthorne on the charge of first degree sexual assault.

Hawthorne argues: "Undeniably, the Defendant's first felony conviction [burglary in 1975] was inadmissible under §27-609(2) for the purposes of attacking his credibility." Brief for appellant at 7. From Hawthorne's preceding statement, one reasonably concludes that the second felony conviction, the assault conviction in 1977, was admissible under Neb. Evid. R. 609(2) for impeachment of Hawthorne's credibility. In addition to the 1977 conviction for felony assault, Hawthorne admitted

that he had been "convicted of giving false information, of lying to the police," although the precise nature of Hawthorne's falsehood is undisclosed, and that he had "lied" to authorities concerning his obligation to pay child support. In the absence of his testimony concerning the burglary conviction, Hawthorne asserts, his credibility would have remained substantially intact and virtually unblemished. In essence, Hawthorne argues that his testimony about the burglary conviction was the evidential straw that broke the back of his credibility camel. However, Hawthorne's admitted falsehood to the police and untruthfulness to child support authorities, acts which indicate a marked propensity to veer from verity, were apt to make an unfavorable impression on the jury in its evaluation of Hawthorne's credibility. The victim's testimony and the circumstances surrounding the incident, independently supported by testimony from witnesses whose veracity was conceded or not seriously challenged by Hawthorne, cannot be categorically disregarded or overlooked by tunnel vision fixed on a solitary aspect of the evidence. When we look at all the evidence against Hawthorne, as we must in applying the *Strickland* test, we cannot conclude that Hawthorne has demonstrated a reasonable probability that the jury would have acquitted him if his counsel had not elicited Hawthorne's testimony concerning the burglary conviction in 1975. After extracting the questioned testimony from the evidence presented to the jury and after a review of the entire record of Hawthorne's trial, we find nothing "sufficient to undermine confidence in the outcome" of Hawthorne's trial, namely, the verdict of guilty. The verdict against Hawthorne is one with "overwhelming record support" rather than a verdict "only weakly supported by the record." Therefore, we must conclude that Hawthorne has failed to establish that his counsel's errors prejudiced Hawthorne's defense and "were so serious as to deprive the defendant of a fair trial . . . ."

Under the test set forth in *Strickland v. Washington, supra,* Hawthorne's claim of ineffective assistance of counsel, as a violation of the sixth amendment to the U.S. Constitution, has no merit. The judgment of the district court is affirmed.

AFFIRMED.