STATE OF NEBRASKA, APPELLEE, V. TIMOTHY C. RODRIGUEZ, APPELLANT.

569 N.W.2d 686

Filed October 7, 1997. No. A-96-1304.

James Martin Davis for appellant.

Don Stenberg, Attorney General, and Mark D. Starr for appellee.

MILLER-LERMAN, Chief Judge, and SIEVERS and MUES, Judges.

PER CURIAM.

## I. INTRODUCTION

Timothy C. Rodriguez appeals his conviction in the district court for Sarpy County of making terroristic threats in violation of Neb. Rev. Stat. § 28-311.01 (Reissue 1995). For the reasons cited below, we affirm.

## II. BACKGROUND

On February 15, 1996, the State filed a criminal complaint charging Rodriguez with making terroristic threats against Lelon Sapp on February 13. On April 19, Rodriguez entered a plea of not guilty.

A jury trial began in the district court for Sarpy County on July 10. After the jury had been sworn in, but prior to the opening statements, counsel for Rodriguez challenged the use of peremptory challenges by the State, alleging that the State had been racially discriminatory in violation of the rule first laid down in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

In connection with his *Batson* challenge, Rodriguez' counsel noted that the sole African-American member of the venire had been stricken by the State. The trial court noted that Rodriguez was not of the same race as the dismissed venireperson. In response, Rodriguez' counsel stated that the *Batson* rule could be applied if a defendant was of a minority group and stated that Rodriguez was Hispanic.

The trial court then observed that while the African-American member of the venire had been dismissed, a Hispanic member of the venire had not been stricken and concluded that *Batson* was not applicable. The trial judge, nevertheless, offered the State the chance to recite for the record why the African-American venireperson had been stricken.

The State first replied that Rodriguez' counsel's challenge was untimely because the jurors had already been sworn in before the *Batson* challenge was urged. Second, the State argued that Rodriguez was not of the "same class" as the dismissed venireperson. Finally, the State said that the reason for the use of the peremptory challenge was that the dismissed venireperson had been "on a prior jury and didn't indicate whether [the verdict] was guilty or not guilty, and I assumed it was not guilty."

The trial court overruled Rodriguez' *Batson* challenge "probably on all three grounds."

With respect to the substance of the case, the first witness for the State was Patricia Balvans, the office manager for and a longtime employee of Sapp, the victim. Balvans testified that she had first seen Rodriguez in February 1996, when he came into Sapp's insurance office in the afternoon. Rodriguez apparently had attempted to assert a claim on an insurance policy that had been sold to him by an agent working for Sapp, but which policy was issued by another company. Balvans testified that Rodriguez seemed agitated and demanded that Sapp's office issue him a check. Balvans stated that she attempted to reason with him, but finally asked him to leave. When he refused, she summoned Sapp.

Balvans testified that after she left Sapp and Rodriguez in Sapp's office, she could hear loud voices, but could not make out what was being said. Rodriguez left soon after. Balvans said that after Rodriguez left the office, she and the other employees had locked the doors and moved several of the vehicles on the premises to someplace where they would be safer.

Balvans testified that about an hour after he left, Rodriguez called Sapp at his office on the telephone. Balvans was able to hear Sapp and Rodriguez speaking on Sapp's speaker telephone, and while she did not hear all of the conversation, she

did hear an exchange in which Sapp asked, "[A]re you threatening me?" and Rodriguez said, "I want my money or something bad is going to happen to you." Balvans testified that she believed Rodriguez' threat and that she was intimidated by him.

Sapp then testified for the State. Sapp stated that when he first encountered Rodriguez, Rodriguez was swearing and was very angry. Sapp said that while they were in his office, Rodriguez had threatened to "blow [him] away." When Sapp asked what that meant, Rodriguez said to Sapp, "You will be dead by tonight." Sapp stated that he had been scared by Rodriguez' threats.

Sapp further testified that later that afternoon, he was again threatened by Rodriguez on the telephone. Sapp then called the police. He also reported that later that afternoon, he received a telephone call from Elaine Rodriguez, evidently Rodriguez' mother. Sapp stated that she was very conciliatory toward him, but did state that Rodriguez was sometimes violent.

The next witness for the State was Deputy Sheriff Melissa Adkins. Adkins testified that she was called to Sapp's place of business, where she took a report from Sapp regarding the incident. On cross-examination, Adkins said that Sapp described Rodriguez as saying to him that "great harm will come to you or your property." After taking Sapp's report, she stated that she and another officer went to see Rodriguez that evening at his residence.

According to Adkins, Rodriguez was generally uncooperative and kept closing the door on the officers such that they had to shout back and forth through closed windows. Finally, said Adkins, her supervisor was able to contact Rodriguez on the telephone, and they were able to talk to him. Adkins said that Rodriguez denied making threats against Sapp's life, but admitted to telling Sapp that he would get some of his friends and "camp out" on Sapp's property and block access to Sapp's office until they were satisfied.

Adkins testified that Rodriguez was agitated and aggressive, so that the officers were nervous and wondered if he might have weapons in his house. Adkins said that they finally issued a citation for third degree assault, which they had to slip under the door of Rodriguez' residence.

On cross-examination, Adkins admitted to an error on her original report regarding the incident. Her report indicated that Rodriguez had come into Sapp's office at approximately 3:15 p.m. Adkins indicated that was an error and that that time should have been indicated as the approximate time of the telephone call from Rodriguez to Sapp, not of Rodriguez' visit to Sapp's office.

The final witness for the State was Monty Daganaar, an investigator for the Sarpy County sheriff's office and the arresting officer of Rodriguez. Daganaar indicated that when he arrested Rodriguez, Rodriguez was angry, particularly at Sapp, and demanded to know why Sapp had not been placed under arrest for being "a crook." Daganaar also indicated that the charges against Rodriguez had been upgraded from third degree assault to making terroristic threats after Daganaar's interview with Sapp, based on what Sapp told him at that time. He also stated that Sapp was genuinely frightened by Rodriguez' threats.

At the close of the State's case, Rodriguez moved for a directed verdict. The motion was taken under advisement. Thereafter, Rodriguez presented evidence.

The sole witness testifying for the defense was Elaine Rodriguez, Rodriguez' mother. Elaine Rodriguez indicated that her son was not violent, but did lose his temper sometimes. She denied telling Sapp on the telephone that Rodriguez was violent, although she admitted to calling Sapp at her son's request. She also testified that during her telephone conversation with Sapp, he indicated to her that her son had made threats against him.

At the close of all the evidence, Rodriguez' counsel said that he would "like to renew my motion to dismiss." The court indicated that the motion would be kept under advisement.

On July 11, 1996, the jury returned a verdict of guilty. Rodriguez filed a motion for new trial on August 5 based on insufficient evidence to sustain his conviction. Sentencing was set for September 6, but Rodriguez failed to appear on that date.

On December 6, Rodriguez appeared for sentencing. Prior to sentencing, Rodriguez presented argument on his motion for new trial. Rodriguez argued that the jury may have been preju-

diced by his misbehavior during the closing arguments at trial. The substance of Rodriguez' alleged misbehavior is not apparent from the record. Rodriguez' counsel then reminded the trial court that he had moved for a directed verdict on two occasions and had not obtained a ruling. The trial court indicated that the first motion for directed verdict, made after the State's case, had been waived because Rodriguez had presented evidence on his own behalf. The trial court then denied the renewed motion for directed verdict, which had been made after all the evidence. Thereafter, the trial court denied Rodriguez' motion for new trial.

Rodriguez was sentenced to 6 months' imprisonment in the Sarpy County Jail. Rodriguez appeals.

### III. ASSIGNMENTS OF ERROR

Rodriguez assigns three errors, which he states as follows: (1) The district court erred by denying Rodriguez' *Batson* challenge, (2) the district court erred by failing to rule on Rodriguez' two motions for a directed verdict, (3) the court erred by not dismissing the case because the evidence was· insufficient as a matter of law to convict Rodriguez.

### IV. STANDARD OF REVIEW

■ A directed verdict in a criminal case is proper only when there is a complete failure of evidence to establish an essential element of the crime charged or when the evidence is so doubtful in character, lacking probative value, that a finding of guilt on such evidence cannot be sustained. *State v. Morley,* 239 Neb. 141, 474 N.W.2d 660 (1991); *State v. Thomas*, 238 Neb. 4, 468 N.W.2d 607 (1991).

■ Regardless of whether evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as failure to direct a verdict, insufficiency of evidence, or failure to prove a prima facie case, the standard of review is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh evidence. Such matters are for the finder of fact, and a conviction will be affirmed, absent prejudicial error, if properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the

conviction. *State v. Glantz,* 251 Neb. 947, 560 N.W.2d 783 (1997); *State v. Lopez,* 249 Neb. 634, 544 N.W.2d 845 (1996); *State v. Pierce,* 248 Neb. 536, 537 N.W.2d 323 (1995); *State v. McCaslin,* 240 Neb. 482, 482 N.W.2d 558 (1992).

■ A trial court's determination of whether a defendant has established purposeful discrimination in jury selection is a finding of fact and is entitled to appropriate deference from an appellate court because such a finding will largely turn on evaluation of credibility. *State v. Bronson,* 242 Neb. 931, 496 N.W.2d 882 (1993); *State v. Edwards,* 2 Neb. App. 149, 507 N.W.2d 506 (1993).

■ A trial court's determination of the adequacy of the State's "neutral explanation" of its peremptory challenges will not be reversed on appeal unless clearly erroneous. *State v. Lopez, supra; State v. Edwards, supra.*

## V. ANALYSIS

### 1. *BATSON* CHALLENGE

Rodriguez argues that the trial court erred in denying his challenge to the State's use of peremptory strikes under *Batson v. Kentucky,* 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), because the trial court mistakenly believed that a defendant and a stricken venireperson must be members of the same racial class and denied Rodriguez' *Batson* challenge on this basis. Rodriguez does not claim the denial of his *Batson* challenge was in error for any other reason. As explained more fully below, we conclude that although the trial court was mistaken in its view of the law to the extent that the trial court understood that a defendant and a stricken venireperson must be of the same race, this misperception is of no consequence in the present case.

■ It is well settled that in order to show that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause, a defendant must first make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race; if such showing is made, the burden then shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried the burden of

proving purposeful discrimination. *Hernandez v. New York,* 500 U.S. 352, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991); *State v. Starks,* 3 Neb. App. 854, 533 N.W.2d 134 (1995).

■ In the instant case, the State argued, inter alia, that Rodriguez' *Batson* challenge was ill founded because Rodriguez, who is Hispanic, and the dismissed African-American venireperson were not of the "same class." The trial court evidently agreed. Contrary to the State's argument and the trial court's apparent agreement, shared identity of race between a defendant and an excluded juror is not required to present a successful *Batson* challenge. In *Powers v. Ohio,* 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991), the U.S. Supreme Court specifically held that common racial identity between a defendant and an excluded venireperson was not a prerequisite for a challenge under *Batson* and that such a requirement would contravene the Equal Protection Clause.

■ In *Powers,* a Caucasian defendant raised a challenge to the exclusion, allegedly based on race, of African-Americans from the jury in his case. The Court stated that "to bar petitioner's claim because his race differs from that of the excluded jurors would be to condone the arbitrary exclusion of citizens from the duty, honor, and privilege of jury service." 499 U.S. at 415. The Court held that "race [of the defendant] is irrelevant to a defendant's standing to object to the discriminatory use of peremptory challenges." 499 U.S. at 416. See, also, *Hernandez v. New York, supra; State v. Starks, supra.* But see, *State v. Allen,* 252 Neb. 187, 560 N.W.2d 829 (1997); *State v. Lopez,* 249 Neb. 634, 544 N.W.2d 845 (1996); *State v. Covarrubias,* 244 Neb. 366, 507 N.W.2d 248 (1993); *State v. Bronson,* 242 Neb. 931, 496 N.W.2d 882 (1993); *State v. Martin,* 239 Neb. 339, 476 N.W.2d 536 (1991); *State v. Edwards,* 2 Neb. App. 149, 507 N.W.2d 506 (1993) (cases in Nebraska decided after *Powers v. Ohio, supra,* that continue to refer to defendant's race as prerequisite to challenge under *Batson v. Kentucky, supra.*)

We acknowledge that Rodriguez raises a valid point regarding the State's and the trial court's misplaced understanding that Rodriguez' *Batson* challenge should be denied because he and the dismissed venireperson were not of the "same class." This misperception, however, does not require reversal, because

Rodriguez' *Batson* challenge was untimely and the State's explanation for excluding the juror in question was nondiscriminatory. In this regard, we note that Rodriguez' brief on appeal does not address either of the other two reasons offered by the State for the rejection of Rodriguez' challenge, i.e., that Rodriguez' *Batson* challenge, which was made after the jury was sworn in, was untimely and that prior jury service of the excluded venireperson was a nondiscriminatory explanation for exclusion. As explained more fully below, we conclude that the denial of Rodriguez' *Batson* challenge based on untimeliness and/or neutral explanation was not clearly erroneous.

■ According to the record, Rodriguez' *Batson* challenge was not made until after the jury had been sworn in. This makes his challenge untimely. An objection under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), must be made prior to the swearing in of the jury; if such an objection is not timely, it has been waived by the defendant. *State v. Covarrubias, supra*. This rule is consistent with that announced by the U.S. Court of Appeals for the Eighth Circuit in *U.S. v. Parham*, 16 F.3d 844 (8th Cir. 1994) (holding that *Batson* objection must be made, at latest, before venire is dismissed and before trial commences). The U.S. Supreme Court has also specifically approved a similar rule in a case appealed from the Georgia courts. See *Ford v. Georgia*, 498 U.S. 411, 111 S. Ct. 850, 112 L. Ed. 2d 935 (1991) (holding that state court may adopt general rule that *Batson* claim is untimely if raised after jury is sworn in).

Since Rodriguez did not assert his *Batson* challenge until after the jury had been sworn in, it was untimely, and his objection was therefore waived.

■ For the sake of completeness, we note that even had a timely objection been made, Rodriguez' *Batson* challenge would have been properly denied. We assume for the sake of this discussion that Rodriguez established a prima facie case of discrimination. We so assume because, under the cases, if the trial court does not state on the record that a defendant has met the burden of proving a prima facie case of purposeful discrimination in jury selection based on the prosecutor's use of peremptory challenges, it does so implicitly by asking the State

to articulate its reasons for the questioned strikes. *State v. Lopez, supra.* The trial court did so here.

As its reason for excluding the African-American venireperson, the State in this case said that the dismissed venireperson had indicated that she had served on a jury before, but that she had failed to indicate the outcome of the trial, and the State said that it had assumed the verdict was not guilty. It was for the trial court to credit this explanation.

It is well settled that a prosecutor's basis for his or her peremptory strikes need not rise to the level of rationality to satisfy the Equal Protection Clause. *State v. Starks*, 3 Neb. App. 854, 533 N.W.2d 134 (1995). The trial court need not determine if the explanation given by the prosecutor for a peremptory strike is reasonable, but only that it is nondiscriminatory and is constitutionally permissible. *State v. Bronson*, 242 Neb. 931, 496 N.W.2d 882 (1993); *State v. Starks, supra.* Accord, *Hernandez v. New York*, 500 U.S. 352, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991); *Gee v. Groose*, 110 F.3d 1346 (8th Cir. 1997). The U.S. Court of Appeals for the Eighth Circuit has specifically indicated that the "prosecutor's explanation 'may be "implausible or fantastic," even "silly or superstitious," and yet still be "legitimate" ' . . . ." *Gee v. Groose*, 110 F.3d at 1351. Under this standard, it is clear that the trial court's acceptance of the State's articulated explanation for its peremptory strike was not clearly erroneous.

Rodriguez' *Batson* challenge to the jury selection was untimely, and the State gave a legitimate nondiscriminatory explanation. Rodriguez' assignment of error pertaining to the denial of his *Batson* challenge is without merit.

### 2. RULINGS ON MOTIONS FOR DIRECTED VERDICT

Rodriguez' second assignment of error claims: "The District Court Erred by Failing to Rule on Defendant's Two Motions for a Directed Verdict." This assignment of error misstates the record.

With respect to the subject of ruling on Rodriguez' motions for directed verdict at the end of the State's case and at the end of the whole case, the bill of exceptions contains the following exchange, which took place on December 6, 1996, in connection with Rodriguez' motion for a new trial and before sentencing:

[Rodriguez' counsel]: . . . If the Court could see that I would submit that he would be entitled to a new trial, and in addition to that we did make motions for directed verdict at the end of the State's case and at the end of our case, which you did take under advisement. My recollection [is] that never was ruled on.

THE COURT: Did you present a case then?

[Rodriguez' counsel]: Yes.

THE COURT: Then you waive my ruling if you make a motion for directed verdict at the close of the State's case, which I take under advisement, and you proceed and produce evidence you waive any —

[Rodriguez' counsel]: Then at the end of our case we renewed the motion.

THE COURT: The motion for directed verdict?

[Rodriguez' counsel]: We renewed it. That would be the sum and substance of the argument, Your Honor.

[Prosecutor]: I would ask you to overrule it. There was sufficient evidence to sustain the verdict.

THE COURT: I am going to deny it.

This exchange shows that, contrary to Rodriguez' assignment of error, the trial court effectively ruled on Rodriguez' motions for directed verdict. Specifically, and as explained more fully below, the record shows first, that by presenting evidence, Rodriguez waived a ruling on his motion for directed verdict at the close of the State's case, and second, that Rodriguez' motion for directed verdict at the close of the evidence was denied.

(a) Motion at Close of State's Case

As noted above, Rodriguez claims that the trial court failed to rule on his motion for directed verdict. In his appellate brief, Rodriguez varies his appellate claims by arguing that error was committed when the trial court, rather than ignoring his motions for directed verdict, instead took his motions for directed verdict "under advisement." We do not find these arguments persuasive.

█ It is well settled that a defendant who moves for a directed verdict at the close of the State's case and proceeds with the presentation of evidence waives any error in ruling on that motion, but may challenge the sufficiency of the evidence for the defendant's conviction. *State v. Severin*, 250 Neb. 841,

553 N.W.2d 452 (1996); *State v. Hirsch*, 245 Neb. 31, 511 N.W.2d 69 (1994); *State v. Massa*, 242 Neb. 70, 493 N.W.2d 175 (1992), *overruled on other grounds, State v. Williams*, 243 Neb. 959, 503 N.W.2d 561 (1993); *State v. Back*, 241 Neb. 301, 488 N.W.2d 26 (1992).

Nebraska jurisprudence is replete with cases in which no error was found where motions for directed verdict at the close of the plaintiff's case were taken "under advisement," regardless of whether or not the defendant thereafter presented evidence. See, e.g., *Hill v. City of Lincoln*, 249 Neb. 88, 541 N.W.2d 655 (1996); *Evertson v. Cannon*, 226 Neb. 370, 411 N.W.2d 612 (1987); *Prudential Ins. Co. v. Greco*, 211 Neb. 342, 318 N.W.2d 724 (1982).

 The apparent rationale for concluding that no error occurs where the motion is simply taken under advisement after the close of the State's case is that a party who fails to insist upon a ruling thereafter waives his or her complaint that the trial court failed to rule on the motion. This court has specifically so held in an unpublished opinion. See *State v. McCauley*, 95 NCA No. 50, case No. A-95-252 (not designated for permanent publication). We note that this situation is analogous to that in which a party fails to insist upon a ruling to an objection during trial and, accordingly, waives that objection. See, e.g., *State v. Nowicki*, 239 Neb. 130, 134, 474 N.W.2d 478, 482-83 (1991) (stating that "although the defendant was entitled to a ruling, he should have made a request for such. By failing to do so the defendant elected instead to allow the preference of the trial court not to rule to stand unchallenged"). See, also, *State v. Fellman*, 236 Neb. 850, 464 N.W.2d 181 (1991).

Rodriguez also argues in his brief that he did not waive his motion for directed verdict at the end of the State's case because the trial court did not specifically overrule his motion, as distinguished from merely taking the motion under advisement. In this regard, Rodriguez relies on cases holding that the presentation of evidence by a defendant waives a motion for directed verdict at the close of the State's case where the trial court first specifically overrules the motion and the defendant thereafter presents evidence. The inference made by Rodriguez is that where there is no ruling, there can be no waiver. In this regard,

Rodriguez refers this court to Maryland cases which he interprets to mean that a waiver by a defendant is effective only "upon denial" of a motion for directed verdict. See, e.g., *Warfield v. State*, 315 Md. 474, 554 A.2d 1238 (1989); *Spencer v. State*, 76 Md. App. 71, 543 A.2d 851 (1988). We do not read these cases or Nebraska cases with similar language as Rodriguez suggests.

A review of Nebraska jurisprudence shows Nebraska cases containing language almost identical to that in the Maryland cases, stating that "upon overruling," a defendant waives a motion for directed verdict after the State's case by the presentation of evidence. See, e.g., *State v. Dawson*, 240 Neb. 89, 480 N.W.2d 700 (1992); *State v. Gray*, 239 Neb. 1024, 479 N.W.2d 796 (1992); *State v. Morley*, 239 Neb. 141, 474 N.W.2d 660 (1991); *State v. Thomas*, 238 Neb. 4, 468 N.W.2d 607 (1991).

Although these cases commonly describe the waiver due to the presentation of evidence after the motion for directed verdict at the end of the State's case has been overruled, a ruling on the motion for directed verdict is not a necessary precondition for the waiver to occur. See, e.g., *State v. Severin*, 250 Neb. 841, 553 N.W.2d 452 (1996); *State v. Hirsch*, 245 Neb. 31, 511 N.W.2d 69 (1994); *State v. Massa*, 242 Neb. 70, 493 N.W.2d 175 (1992); *State v. Back*, 241 Neb. 301, 488 N.W.2d 26 (1992). Thus, where a defendant makes a motion for a directed verdict at the end of the State's case, whether ruled upon or not, and the defendant thereafter presents evidence, the defendant has waived any error in connection with the motion for directed verdict made at the end of the State's case. *State v. McCauley, supra.*

In sum, Rodriguez has waived any error in the court's treatment of his motion for directed verdict made at the close of the State's case by his failure to insist upon a prompt ruling and by his presentation of evidence.

### (b) Motion at Close of All Evidence

With respect to Rodriguez' second motion for directed verdict made at the close of all the evidence, as noted above, the motion was brought to the trial court's attention before the trial court ruled on the motion for a new trial and before sentencing, and a denial of the motion for directed verdict was issued by the

court. In his brief, Rodriguez' appellate argument is limited to the claim that the trial court failed to rule on this motion. In the instant case, the trial court did not fail to rule on this motion, although the ruling was belated. In this regard, we note that Nebraska jurisprudence includes cases in which no error was detected where a defendant's motion for directed verdict was taken under advisement at the close of all the evidence and the case was submitted to the trier of fact. See, e.g., *Scholl v. County of Boone*, 250 Neb. 283, 549 N.W.2d 144 (1996); *Jones v. Foutch*, 203 Neb. 246, 278 N.W.2d 572 (1979). This is so even where the motion was ruled upon after the jury returned a verdict. See, e.g., *Jones v. Foutch, supra.*

It is clear from the record that the trial court found the evidence sufficient to submit the case to the jury. There was neither a failure of proof of an element of the crime charged nor evidence so doubtful in character, lacking in probative value, that a finding of guilt could not be sustained. See, *State v. Morley, supra*; *State v. Thomas, supra*. This assignment of error is without merit.

### 3. SUFFICIENCY OF EVIDENCE

Rodriguez claims that the evidence presented at trial was insufficient to convict him as a matter of law. We do not agree.

Rodriguez was convicted of making terroristic threats as defined by § 28-311.01, which reads:

(1) A person commits terroristic threats if he or she threatens to commit any crime of violence:

(a) With the intent to terrorize another;

(b) With the intent of causing the evacuation of a building, place of assembly, or facility of public transportation; or

(c) In reckless disregard of the risk of causing such terror or evacuation.

(2) Terroristic threats is a Class IV felony.

The crime of making terroristic threats does not require an intent to execute the threats made or that the recipient of the threat be terrorized; rather, the statute and cases require that the perpetrator have the intent to terrorize the victim as a result of the threat or a reckless disregard of the risk of causing such terror. *State v. Saltzman*, 235 Neb. 964, 458 N.W.2d 239 (1990).

In *Saltzman*, the defendant was convicted of making terroristic threats during telephone calls in which he made remarks such as " '[Y]ou're gonna die, you bitch!' " and " '[Y]ou're going to die. I'm going to blow up your house.' " 235 Neb. at 966, 458 N.W.2d at 241-42. The Nebraska Supreme Court held that evidence of these remarks was sufficient to sustain conviction for the commission of making terroristic threats.

▮▮ The similarity is apparent between the remarks made in *State v. Saltzman, supra,* and the remarks made in the present case. Rodriguez argues that the requisite element of intent was not proven, since his "intent was hidden." Brief for appellant at 10. As noted, however, in *Saltzman,*

> When the sufficiency of the evidence as to criminal intent is questioned, a direct expression of intention by the actor is not required; the intent with which an act is committed involves a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident.

235 Neb. at 969, 458 N.W.2d at 243.

In the present case, the evidence, taken in the light most favorable to the State, supports the inference that Rodriguez intended to terrorize Sapp, either out of anger or in the hope that intimidating Sapp would afford Rodriguez the relief he sought. Moreover, even if evidence of intent was lacking, the evidence in the case supports a finding by the jury that Rodriguez acted with reckless disregard for the effect his threats would have on Sapp.

Rodriguez also questions the sufficiency of the evidence on the ground that Sapp's testimony was necessary for conviction and was uncorroborated by the State's other witnesses. We note, however, that Sapp's testimony was consistent with the testimony of the State's other witnesses and was generally uncontradicted by Rodriguez' mother, who was the sole witness offered by the defense.

▮▮ Rodriguez' argument about the details of Sapp's testimony in effect challenges the credibility of Sapp as a witness. The credibility of a witness and the weight to be given to the testimony of that witness are issues for the jury to resolve. *State v. Thomas*, 238 Neb. 4, 468 N.W.2d 607 (1991). The jury was

permitted to credit the testimony of Sapp, and the testimony of Sapp was sufficient and essentially uncontradicted.

We, therefore, find that the evidence, viewed in the light most favorable to the State, is sufficient to support the conviction, because a rational trier of fact could have found the essential elements of the crime of making terroristic threats had been proved beyond a reasonable doubt. This assignment of error is without merit.

## VI. CONCLUSION

For the reasons cited above, we affirm Rodriguez' conviction in the district court for Sarpy County of making terroristic threats.

AFFIRMED.